MEMORANDUM OF DECISION
This is an action for termination of parental rights brought by the Department of Children and Families (DCF). The respondents are Sylvia S., who is the female biological parent of the minor children, Neil, Sarah, Ashley, and Nathan, and Russell S., the male biological parent of the minor children Nathan and Ashley. The male biological parent of Neil is unknown. The petitioner believed that the male biological parent of Sarah was Russell S. when the case was commenced. During the course of the litigation CT Page 9486 the mother named one Thomas M. as Sarah's father. Thomas admitted his paternity (States Exhibit #38) and signed a consent which was accepted by the court (Potter, J.) The married respondents Sylvia S. and Russell S. have been served with process and have appeared and were represented by counsel throughout the this case which commenced on August 13, 1996. Both parents resisted a termination of their parental rights until the commencement of trial on April 16, 1997. On that date the male biological parent, Russell S., also filed a consent to terminate his parental rights. He was canvassed, the pleadings were orally amended to reflect his consent, the consent was accepted by the court and found to have been knowingly and willfully made with the advice and assistance of competent counsel.
FINDINGS OF FACT
During the four days of trial, the court heard from DCF caseworkers; the Program Director of Sexual Abuse Services for a local agency; Dr. Robert Meier, the court appointed psychologist; Barbara Grover, mother's therapist; various children's therapists; foster parents; and Dr. Ronald Anderson, an acknowledged specialist in the treatment of sexual offenders, who testified on the mother's behalf. The Assistant Attorney General thought it necessary to enter fifty-four exhibits into evidence. The mother offered three relevant and probative exhibits; the child's attorney offered one relevant and probative exhibit.
The court has considered the documents placed into evidence, all of the testimony of the witnesses and reviewed the portions of the file to which the court has announced appropriate for judicial notice. The court makes the following factual findings by clear and convincing evidence:
1. Neil was born on April 29, 1984. He is presently 13 years of age. His father is an unknown person. He has exhibited behavioral problems in the past but is presently well adjusted in a pre-adoptive foster home. He, like all his siblings, has been out of his home of origin since Sept. 21, 1992, and like all his siblings, is presently in therapy to deal with his exposure to severe sexual abuse which occurred in the home of his family of origin.
2. Sarah was born on May 1, 1986. She is presently eleven years of age. She is ". . .doing very well, an average child with special needs. ." who views her foster parents as her parents. CT Page 9487 She has been labeled as mentally retarded. The foster parents are interested in keeping her as a permanent member of the family. Her male biological parent has consented to the termination of his parental rights.
3. Ashley was born on Sept. 1, 1987. She will be ten in September. She is presently in therapy and has been diagnosed as Attention Deficit-Hyperactive Disordered. The foster parents would like to adopt her. She is described as comfortably doing well. Her male biological parent has consented to the termination of his parental rights.
4. Nathan was born on March 5, 1989. He was three when he went into foster care. He also has ADHD, low average intelligence, and has had behavioral problems. His foster parents will continue to care for Nathan until a good adoption home can be found for him if the termination for parental rights petition is granted. His male biological parent has consented to the termination of his parental rights.
5. The children were removed from the parents care on Sept. 21, 1992. The family had been the subject of Department of Children and Youth Services investigation and support services since 1990 following fires in their apartment, truancy issues, hot water scald burns on the children, and in-home cleanliness issues. The court has previously found that reasonable efforts were made to prevent the removal of the children from the home (Silbert, J.).
6. The family has had at least six social workers assigned to this case: Wendy Sweeney, Jane George, Audrey Richardson, Heather Panciera, Michael Winakor and Mary Dunion. While the children were committed to the Commissioner of the Department of Children and Youth Services (now know as the Department of Children and Families, "DCF") in December, 1992, an action to terminate the parental rights was not commenced for nearly four years, a practice that is regrettably too common. These children will have lived in a state of legal uncertainty as wards of the State for five years as of August.
7. The known fathers of these children have consented to the termination of their parental rights. Russell S. has been convicted and sentenced for Risk of Injury charges to these children as a result of his flagrant sexual practices with them. CT Page 9488
8. The mother, Sylvia, is nearly 34 years of age. A very slight person, weighing by the court's estimate well under 100 lbs. She was the oldest of 9 children. She quit school at age sixteen, having advanced only to the seventh grade because of her learning disabilities, frequent relocations, and catastrophic home life. She was sexually victimized as a child by her step father. She would make herself available to him sexually so that he would not victimize her younger siblings. Her mother did not believe that her husband was sexually abusing Sylvia. At 16 Sylvia balked at step-father's advances and criminal charges were brought against him. At the insistence of her mother, the children recanted their complaints and the step-father was not prosecuted.
Sylvia was further victimized by her husband, Russell, who was a substance abuser, womanizer, and who sexually and physically abused Sylvia, and her children. To Sylvia's further detriment she suffers from a genetic disorder known as neurofibromatosis which causes tumors along her nerves, brain and spinal chord.
9. The evidence and testimony detail many sexual acts and events, principally by the father, but also possibly by the mother, which the children either observed or were participants.[2] The mother admits only that the children may have seen the husband having sex with her, forcing himself upon her. The children reported to their therapists that when the children brought to her attention the sexual conduct of Russell with them, she is reported to have told them ". . .don't tell Dad I said this, but don't let him do it." The court finds that, at a minimum, Sylvia knew of the sexual exploitation of her children and failed to protect them. The court further finds the children have been profoundly effected by the sexual exploitation to which they were exposed in their home of origin and still suffer the consequences nearly five years later.
10. The court finds that the mother loves her children and wants them to know that she "fought for them to the end". She further realizes that the children may be better off now and may be well adjusted in their present homes. She does not wish to cause them more pain nor to disrupt their lives. (See Respondent Mother's Exhibit # C. Offered into evidence by the mother at the end of the trial.) The court further finds that the mother never lost interest in her children and visited them when permitted to do so. CT Page 9489
11. Sylvia began therapy with Barbara Grover in March of 1992. She attended more than 80 sessions with the therapist. The therapist reports that Sylvia made good progress on many of her personal issues and that she has always maintained her interest in the children and visited when permitted by DCF. Areas identified as needing work were, parenting issues, house-keeping issues, control of her children, limit setting, using good judgement, keeping the children safe, her own education issues, child development issues, anger management, that is, being more appropriate in her display of temper, substance abuse issues, passive/dependency issues with her husband, issues regarding her family of origin and her own victimization. The therapist testified that Sylvia had a sense that she was being required to do some things with the expectation that she would get her children back, but that on some level Sylvia believed that DCF did not intend to return her children.
Dr Ronald D. Anderson testified on behalf of Sylvia. He testified that as a results of his testing, it was his opinion that Sylvia was not a sexual perpetrator. He believed that a petition to terminate the parent's rights was premature in that Sylvia had not had enough time to demonstrate her parental skills and her victimization had not been adequately taken into account. Unfortunately for Sylvia, Dr. Anderson also testified that Sylvia was still not at the point where she could accept responsibility for failing to protect her children and that, once she acknowledged responsibility, it would take an addition two to three years of therapy to resolve her problems. At the date of his evaluation, May 15, 1996, he did not think she was then ready to parent her children.
 "The present impression is that Sylvia offered a rather realistic picture of her own passive role in the sexual trauma of the children, by failing to protect them from seeing her have sexual pleasure from her husband. This is not a trivial matter, and while she may have felt helpless and rationalized that she was effectively protecting them, the exposure to adult sexual acts undoubtedly had a very serious negative impact on them. She has yet to register that Ashley appears to have been profoundly traumatized by being in bed with her parents while they were having sexual relations." (Respondent's Exhibit B)
 ADJUDICATION
CT Page 9490
The petitioner has failed to establish all of her allegations regarding the grounds for termination of parental rights. The court finds this practice of claiming every possible fault ground extremely inconsiderate to the respondents, and inappropriate as a legal pleading. Several of the grounds were clearly inappropriate. In Re Sarah K., NO. CP94-000507-A, Child Protection Session (Jan 28, 1997). Since the respondent fathers have consented, the fault grounds must be analyzed as they relate to the mother only.
1. "The child has been abandoned by the mother in the sense that the parent(s) failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the children;"
The court finds that the Commissioner has failed in her effort to establish abandonment. See paragraph 10 of the findings. This count of the petition is dismissed.
 2. "There is no ongoing parent-child relationship with respect to the mother/father which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child".
The court finds that any relationship which may have existed or could have been re-established was thwarted by the termination of the mother's visitation. It was a cruel hoax[3] to make such an allegation. This ground for termination is dismissed.
 3. "The child has been found in a prior proceeding to have been neglected or uncared for. The mother/father has/have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children, he/she/they could assume a responsible position in the life of the children."
The court finds by clear and convincing evidence that Sylvia has made a degree of personal rehabilitation which is personally beneficial and encouraging to her individually. The court finds, CT Page 9491 however that this rehabilitation has not been sufficient to encourage the belief that within a reasonable time considering the age and needs of the children, that she could resume a responsible parental role. In Re Christina V., 38 Conn. App. 214
(1995) 660 A.2d 863. Both Dr. Meier and Dr. Anderson believe she needs continued treatment. The children have waited for closure too long already. The court finds that the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children, she could assume a responsible position in the lives of the children.
 4."The children have been denied, by reason of an act or acts of parental commission or omission by the mother/father the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights;"
This ground is the most applicable of the grounds alleged. Here the children have been clearly exposed to inappropriate sexual exploitation. The father has been convicted of a crime related to the abuse, the mother has, at a minimum, failed to protect the children and, after nearly five years, is only marginally able to deal with her responsibility, if not participation in those events. The court finds that this ground has been proven by clear and convincing evidence.
The court finds that these two grounds have existed for more than one year.
Mandatory Findings
Having determined that grounds for terminating the parental rights exist, the court must then consider the seven factors set forth in § 17a-112 (d) as amended.
(1) The timeliness, nature and extent of services offered or provided the parents and the children by an agency to facilitate reunion. The court finds that services have been offered and provided, to some avail, in this case. Visitation services were initially provided, many parent services were offered before the CT Page 9492 children were removed from the home, counseling services and psychological evaluations were conducted.
(2) Whether the agency has made reasonable efforts to reunite the family pursuant to the requirements of the federal Child Welfare Act of 1980 as amended. The court notes that the agency (DCF) has offered and provided services as above and as set forth more specifically in the Social Study (Petitioner's Exhibit # 37).
(3) With respect to court orders, service agreements and expectations The parties entered into court expectations (Exhibit #1B). The mother did her best to comply with the expectations.
(4) The feelings and emotional ties of the children with respect to the parents and other caretakers. The children have ambivalent feelings about their mother. They feel safe, secure and are doing well in their present foster care. The mother represents a part of the childrens history which they are trying to overcome in therapy. Since the children have not been in the mother's care in nearly five years, it would be unrealistic to expect a parental bond to exist.
(5) The court has considered the ages of the children (see earlier findings) and the great length of time in the children's life's that they have been in foster care. Permanency planning is essential.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interest of the children to return him home in the foreseeable future, etc. Mother has made great effort to adjust her circumstances through counseling. Regrettably, she has yet to fully acknowledge and deal with her role in the children's sexual abuse. While the mother's means were limited, she was able to participate in therapy and to separate from her abusive husband.
7) Finding regarding the prevention of a parent from having a meaningful relationship etc. The whole placement process in foster care undermines the parental relationship. The nature of the disclosures by the children to the therapists motivated the therapists to recommend against visitation for mother. This therapeutically indicated conduct further eroded the relationship between mother and children. Time away from the parent acted as yet another barrier to maintaining the parent child relationship. CT Page 9493 All of these events were done to keep the children safe. At the same time they operated against maintaining a meaningful relationship.
DISPOSITION
"Our statutes and case law make it crystal clear that the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence." In re ValerieD., 223 Conn. 492, 511, 613 A.2d 478 (1992). Here the court has found that grounds exist to terminate the parents rights to the children. The court has also considered the mandatory findings and concludes from the totality of circumstances that termination of parental rights is in the children's best interest. This finding is made after considering the childrens' sense of time, their need for secure and permanent environment, the relationship the children have with their foster parents and the totality of circumstances. In Re: Juvenile Appeal, (anonymous) 177 Conn. 648,667-668, 420 A.2d 875 (1979). See generally, J. GOLDSTEIN, A. FREUD AND A. SOLNIT, BEYOND THE BEST INTERESTS OF THE CHILD 99 (1979).
ORDER
The court, having considered all statutory considerations and having found by clear and convincing evidence that grounds exist for termination of parental rights and, upon all of the facts and circumstances presented, that it is in the children's best interest to terminate the parental rights of Russell S. and Thomas M. by their consent, and to terminate the parental rights of Sylvia S. for the reasons previously expressed. Accordingly, it is ordered that their parental rights in and to the minor children, Neil M., Sarah S., Ashley S., and Nathan S. are hereby terminated. It is further ordered that the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for the purpose of securing an adoptive family or other permanent placement for said children and that the Commissioner shall file with the Superior Court for Juvenile Matters no later than 90 days following the date of judgment a written report toward such permanent placement, and file such further reports as are required by state and federal law.
FOLEY, J. CT Page 9494